53,835-05

# IN THE TEXAS COURT OF CRIMINAL APPEALS
## AT AUSTIN, TEXAS

EX PARTE § 

§ 

§            **WR-53,835-05**

§ 

CARL MATTHEW BELLOTTI, III § 


# N O T I C E
## in re the "Off Limits" trial Record

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 18 2015

Abel Acosta, Clerk

Philip W. "Phil" Moore, Petitioner *Pro $e*
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

## IN THE TEXAS COURT OF CRIMINAL APPEALS
## AT AUSTIN, TEXAS

EX PARTE §
§
§ WR-53,835-05
§
CARL MATTHEW BELLOTTI, III §


# N  O  T  I  C  E
## in re the *"Off Limits"* trial Record

Philip W. "Phil" Moore, Petitioner *Pro Se*
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

# IN THE TEXAS COURT OF CRIMINAL APPEALS
## AT AUSTIN, TEXAS

EX PARTE

§
§
§
§
§
§

WR-53,835-05

CARL MATTHEW BELLOTTI, III

# N O T I C E
## in re the "Off Limits" trial Record

TO THE HONORABLE JUDGES of said court:

COMES NOW CARL MATTHEW BELLOTTI, III, APPLICANT *Pro $e*[1] in the above-styled and numbered cause, by and through Philip W. "Phil" Moore, who presents this his **NOTICE in re the "Off Limits" trial Record** pleading(s) in the above-styled and numbered cause in accordance with, *inter alia,* Article 11.12 (Who May Present Petition)[2] of our Texas Code of Criminal Procedure and its "Hornbook Law" progenies and who, in support thereof, would respectfully show this Honorable Court the following:

## I
## PROCEDURAL BACKGROUND

*Once again* in the interest(s) of brevity, Applicant has raised two (2) Grounds for Relief in the habeas pleading(s) filed on his behalf on Monday, February 9th, 2015 —

---

[1]   **ALL "emphasi$" belongs to this writer** unless otherwise indicated.

[2]   Either the party for whom the relief is intended, **or any *person* "for" him**, may present a petition to the proper authority for the purpose of obtaining relief.

Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722.

ineffective "assistance" of trial counsel (a/k/a IAC) based primarily on "trial" counsel's failure(s) to so much as attempt to impugn the testimony of the State's "Star" Witnesses identified infra and Prosecutorial Misconduct based primarily upon the State's *knowing and intentional* subornation of perjured testimony (viz, Inconsistent Statements as defined by V.T.C.A., Texas *Penal* Code §37.06) on the part of its two (2) "Star" Witnesses, Groves Police Department Sergeant Kevin Russell White and a Lay Witness by the name of Aelisa Faye Sanders.

. . .and despite *prima facie* evidence in support of Applicant's allegations and lengthy *verbatim* quotations from the **Strickland** Court's two-pronged test now required for analysis of such IAC allegations,[3] the habeas court below has entered its so-called Findings of Fact and Conclusions of Law asserting that

> ". . .[A]pplicant has failed to meet his twin-burden of production and persuasion for establishing his IAC claim, as required under **Strickland v. Washington**, 466 U.S. 668, 687-688 (1984), by a preponderance of the evidence . . .."

". . .FINDINGS, CONCLUSIONS . . ." @ p. 5. Worse yet, the habeas court below has ordered the Jefferson County District Clerk's Office to immediately forward to this Honorable Court

> ". . .[t]he *[C]lerk's* [R]ecord in . . .[Cause] No. 09-072[83] . . .,"

ID. @ p. 6 (4), rather obviously intent upon compelling this Honorable Court to reach the merits vel non of the case at bar *without benefit of the Official **Reporter's (trial) Record!?***

. . .and then **most alarmingly**, when this writer placed a telephone call to Deborah Ann (Ann) Manes — the Assistant Jefferson County District Attorney who filed the State's *Original* Answer pleading(s) in the case at bar — to question her about the

---

[3] See MEMORANDUM @ pp. 17-19.

-2-

habeas court's exclusion of the Official *Reporter's* (trial) Record from its so-called "Transmittal" Order, Ann Manes actually had the unmitigated gall to respond that

> "...the Official *Reporter's* (trial) Record is *Off Limits on Habeas Corpus!!?*"

# *REDUCTIO AD ABSURDUM*

Ths sockdolager is simply this: as even a cursory review of those highlighted portions of Exhibits "A" & "B" reveals, the Official Court Reporter's trial Record *certainly* wasn't "Off Limits" in the **Duffy and/or Burkhalter** cases decided by this Honorable Court (and cited by this writer in the pleadings germane to the case at bar) and it is not — *and cannot be* — "Off Limits" in this **Bellotti case!!!?**

FURTHER PETITIONER SAYETH NOT.

## II
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Applicant respectfully prays that this Honorable Court will O R D E R the habeas court below to ORDER the Official Court Reporter of the 252nd Judicial District Court of Jefferson County, Texas to provide this Honorable Court with a certified copy of said *trial* Record to enable this Honorable Court to comply with our United States "Supreme" Court's mandate(s) that

> "...a court deciding an actual ineffectiveness claim *must* judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct.* A convicted defendant making a claim of ineffective assistance *must* identify the acts or omissions of counsel **[shown in the Official *Reporter's* (trial) Record]** that are alleged not to have been the result of

- 3 -

reasonable professional judgment. The court **must** then determine whether, in light of all the circumstances, the *identified* **[in the Official Reporter's (trial) Record]** acts or omissions that were outside the wide range of professionally competent assistance. . . ."

**Strickland v. Washington,** *supra.* In the alternative, this Honorable Court could (and probably should) rely upon the true and correct copy of the *entire* Official Court Reporter's **(trial)** Record — **BOTH TRIALS/all five (5) Volumes** — which was hand-delivered to Hon. Abel Acosta, Clerk of this Honorable Court by Petitioner *at Petitioner's expense* on Wednesday, March 11th, 2015 to enable the Court to reach the merits vel non of Applicant's claims in the case at bar in a manner consistent with the mandate(s) of the **Strickland** Court.

*CLEARly,*[4] because Applicant has alleged facts which, if true, would *surely* entitle him to the relief sought, the proper course of action is to

> ". . .remand this matter to the trial court for resolution of the factual issues presented in accordance with Article 11.07, § 3(d) of the [Texas] Code of Criminal Procedure."

**Ex parte Patterson,** No. 72,866, 993 S.W.2d 114, 115 (Tex. Crim. App. – 05/26/1999) (Holland, J., delivering the *unanimous* opinion of the Court).

> ". . .In these circumstances, *additional facts are needed.* As [this Honorable Court] held in **Ex parte Rodriguez,** 334 S.W.2d 294, 294 (Tex. Crim. App. 1960), the trial court is the appropriate forum for findings of fact."

**Ex parte Hinojosa,** WR-82,619-01 & WR-82,619-02 [ORDER @ p. 3] (Tex. Crim.

---

[4]     For some definitions of the word *clearly,* see BLACK'S LAW DICTIONARY, Ninth Edition (2009), West Publishing Co., Inc., St. Paul, MN @ p. 267.

- 4 -

App. – *Per Curiam* – 02/25/2015)[5] (not designated for publication) *and* **cases cited therein**. At the very least, this Honorable Court should O R D E R the habeas court below to

> "...conduct a live [E]videntiary [H]earing [in this case], at which [Groves Police Department Sergeant Kevin Russell White, Aelisa Faye Sanders and *both* Prosecutors — Ernest Perry Thomas and Patrick W. (Pat) Knauth] shall be called to testify. ...."

**Ex parte Contreras,**[6] WR-80,635-02 [ORDER @ p. 3] (Tex. Crim. App. - *Per Curiam* - February 4th, 2015) (not designated for publication) *and* **cases cited therein**.

Respectfully submitted,

*Philip W. Moore*

Philip W. "Phil" Moore, Petitioner *Pro $e*

## III
## CERTIFICATE OF SERVICE

I, Philip W. "Phil" Moore, Petitioner in the above-styled and numbered cause and the Amicus Curiae "person" alluded to throughout pleadings filed in the case at bar, hereby certify that the original and ten (10) true and correct copies of these NOTICE in re the "Off Limits" trial Record pleading(s) have been served upon the members of this Honorable Court by hand-delivering them as follows:

---

[5] Can't get much more "current" than *that!?*

[6] Relief was *finally* GRANTED on February 25th, 2015 because "the truth, the whole truth and nothing but the truth" was *finally* allowed to prevail!!!?

- 5 -

*PWM*

Hon. Abel Acosta, Clerk
Texas Court of Criminal Appeals
Supreme Court Building
201 West 14th Street, Room 106
P.O. Box 12308
Austin, Texas 78711-2308
Phone: (512) 463-1551
FAX: 512/463-7061
e-mail: abel.acosta@txcourts.gov

Date: 03/18/2015 ATTEST: *Philip W. Moore*
month/day/year        Philip W. "Phil" Moore, Petitioner *Pro $e*

I further certify that — as soon as I can get to the Post Office from the Supreme Court Building where the Court of Criminal Appeals is located — three (3) true and correct **date-stamped *"RECEIVED"*** copies of these NOTICE in re the *"Off Limits"* trial Record pleadings will be served upon the below named individual(s)[7] by placing the same in the United States Mail, First Class postage pre-paid, as follows:

Debbie Folse, Deputy District Clerk
Felony Criminal Section
Jefferson County District Clerk's Office
Jefferson County Courthouse
1085 Pearl Street, Room 203
Beaumont, Texas 77701-3545
Phone: (409) 835-8580
FAX: 409/835-8527
e-mail: dfolse@co.jefferson.tx.us

Date: 03/18/2015 ATTEST: *Philip W. Moore*
month/day/year        Philip W. "Phil" Moore, Petitioner *Pro $e*

---

[7] . . .with one (1) copy each being intended for the records and files of the Jefferson County District Clerk's Office, Hon. Raquel West, Judge Presiding of the 252nd Judicial District Court of Jefferson County, Texas and the State's Attorney, Deborah Ann (Ann) Manes.

# ADDENDUM

## *TRACKING SLIP*
## VERIFICATION
### of Service

# EXHIBITS

– A –

*See* pp. 14-17, infra*

**607 S.W.2d 507 (1980)**

## Ex parte Harvey Joseph DUFFY, Jr.

### No. 64863.

**Court of Criminal Appeals of Texas, En Banc.**

October 1, **1980**.
Rehearing Denied November 26, **1980**.

*508 Maury Maverick, Jr., San Antonio, Mike Tobin, Huntsville, Gerald H. Goldstein and Robert H. Ozer, San Antonio, for appellant.

Bill M. White, Dist. Atty., Charles T. Conaway and Douglas V. McNeel, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

Before the Court en banc.

# OPINION

CLINTON, Judge.

This is a post-conviction application for writ of habeas corpus under the ambit of Article 11.07, V.A.C.C.P.

On September 14, 1976, petitioner was convicted of the offense of capital murder and assessed death after the jury returned with affirmative findings to the three special issues submitted under Article 37.071, V.A.C.C.P. On direct appeal, the Court affirmed the judgment of conviction without dissent, one judge concurring in the result. *Duffy v. State*, 567 **S.W.2d** 197 (Tex.Cr.App. 1978). The Supreme Court of the United States, two justices dissenting, denied petitioner's application for writ of certiorari on November 27, 1978. *Duffy v. Texas*, 439 *509 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978) (Brennan and Marshall, JJ., dissenting consistent with their expressions in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 [1972]).

Having exhausted his avenue of direct appeal, petitioner filed an application for writ of habeas corpus in the 186th District Court of Bexar County on January 8, 1979, alleging that he was denied the effective assistance of counsel during his capital murder trial. Petitioner also advanced the contention that during the course of the trial as well as at critical times prior to trial, he was so heavily sedated by physicians employed by the State that he could not adequately comprehend nor participate intelligently in his own defense. From March 15 through March 19, a hearing was held in the 186th District Court on petitioner's application. On June 4, 1979, the Judge of the habeas court entered findings of fact and conclusions of law on the application recommending that relief in all things be denied. On original presentation to this Court, application for writ of habeas corpus was denied

without written order on April 30, **1980**. Some two weeks thereafter, however, the Supreme Court of the United States decided *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) in which the Court rejected conventional legal thought dichotomizing retained and appointed criminal defense counsel; *viz,*

> "Since the State's conduct of a criminal trial itself implicates the State in the defendant's conviction, *we see no basis for drawing a distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers."*[11]

*Id.* at 446 U.S. 344, 100 S.Ct. at 1716.

Because Part III of the opinion in *Cuyler v. Sullivan,* supra, from which the above excerpt is taken,[2] obliterates any distinction previously made between criminal lawyers in testing for "state action,"[3] we granted petitioner's motion for rehearing on May 28, **1980**, limited to the question of alleged failure of retained counsel to provide adequate representation. The matter was submitted to the Court En Banc June 18, **1980**, on briefs and oral argument. From our examination of the record and aided by the submissions, we are convinced that petitioner was not afforded "effective assistance of counsel,"[4] and now vacate the judgment of conviction and sentence of death, and grant the relief sought.

I.

> "On January 14, 1976, the body of Louise Word, an eighty-year-old woman, was found in her house in a rural area of Bexar County. The evidence showed that she had been stabbed ten times with a knife. The front screen door of her house was bent and twisted, indicating a struggle had taken place. Large bloodstains were found in the living room and trails of blood led to the bedroom where the body of the deceased was found. Drawers in the house appeared to have been opened and rifled.

> *510 "On January 16, 1976, [petitioner] was arrested in Fredricksburg, where he subsequently made a confession to the crime. The evidence reflects that [petitioner] had been in possession of checks belonging to the deceased, and that for two and one-half days [petitioner] had been forging and cashing the checks in three cities. Other evidence found at the scene of the crime connected [petitioner] with the murder."

*Duffy v. State,* supra at 199-200.[5]

On April 14, 1976, petitioner was indicted for the offense of capital murder and on May 5, 1976, Judge Preston H. Dial, Jr., appointed Lonnie Duke, Esq. to represent petitioner in the case. On June 2, 1976, Antonio Cantu, Esq. was also appointed by the trial judge to assist Duke in preparation and trial of the case. During their tenure as counsel, Duke and Cantu prepared and filed a motion for a court appointed psychiatrist as well as a motion for discovery. Neither motion was ever presented to or acted upon by the trial court due to a turn of events beginning soon after these motions were filed.

Between the hours of ten and eleven o'clock on the evening of June 22, 1976, petitioner's father received a telephone call from one who identified himself as Joel Conant, an attorney. Conant said he had talked with his son and was "very much interested" in his case, and would like to discuss it further during office hours the following day. The next morning, Mr. **Duffy** went to Conant's office where he was formally introduced to the lawyer and again was told that Conant was interested in handling petitioner's case. The pair then went to the Bexar County Jail to visit petitioner; on the way over, Mr. **Duffy** recalled, Conant gave him "the impression that he was an expert in criminal law and prosecuting [sic] capital murder cases." Following their visit with petitioner an agreement was reached that Conant would defend petitioner in the pending capital murder prosecution. Later in conversation with his son did Mr. **Duffy** learn that before he was retained Conant had in fact approached petitioner at the Bexar County Jail upon the advice of a jail guard with whom Conant had some character of relationship.

Some three weeks later, Conant announced ready when the case was called for trial on July 12, 1976, however, the trial judge, who later would be the habeas judge, opined that Conant surely needed more time to prepare for trial, and reset the case. Shortly, signals of discontent with Conant appeared in a letter that petitioner dispatched to the trial judge. It relates and requests:

> "I am writing you in regard to the postponement of my trial as ordered by you on July 12, 1976.

> "It was the stipulation of the court that the reason for the postponement was to allow me to examined [sic] and treated for hepetitus [sic]. As til [sic] this date I have not been examined nor treated for hepetitus [sic]. Not only that Judge Barlow, but the medicine prescribed for me in relation to a nerve condition has been discontinued.

> *"I have been in hopes [sic] that my attorney would pay me a visit and could perhaps explain these things and inquire of the officials here of the jail why your explicit orders have been ignored. However, he hasn't been to see me since I was in court July 12, 1976. He is not court-appointed attorney [sic]. I have written him but have not received a reply nor acknowledgement of my letter.*

> *"I suppose this is an unusual request, but sir, could you please have my attorney contact me regarding the medical problem?"*

*511 We are not informed how this matter was resolved. Yet the record does show that before trial began Conant visited his client twice and conferred with his father on two occasions-"and if either lasted over fifteen minutes ... I would be surprised," said Mr. **Duffy**. What petitioner said to his attorney is not revealed, but Mr. **Duffy** told Conant that his son had been under the care of a psychiatrist, naming him, for over a year and that the psychiatrist was available to testify about the mental condition of petitioner and the prior treatment given him. Mr. **Duffy** also informed Conant of at least two other potential witnesses for his son: one, a former girlfriend knowledgeable about circumstances surrounding his confession; two, a police officer who would testify about his character.

Conant did not move for appointment of a psychiatrist to examine his client or present to the trial court for determination the motion that the appointed attorneys had prepared and filed. Neither did he present a motion for discovery nor call up the one previously filed. Nor did he move to suppress petitioner's confession. His only pretrial motion was for individual voir dire of prospective jurors, a procedure sanctioned by Article 35.17, V.A.C.C.P. and followed as a matter of custom and practice in Bexar County.

Trial began September 7, 1976; the docket sheet reflects that a jury was selected in less than eleven hours. Conant did not voice any objection on the basis of _Witherspoon v. Illinois_, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) to some seven jurors who were challenged for cause even though there was no showing that any of the seven were irrevocably committed to voting against the death penalty regardless of the facts of the case. See also _Adams v. Texas_, ___ U.S. ___, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). The record does not affirmatively reflect that any of the prospective jurors were required to state under oath, consistent with V.T.C.A. Penal Code, § 12.31(b), that the mandatory penalty of life imprisonment or death would not affect their deliberations on any issue of fact.[6]

In presenting its case, the State called some twelve witnesses who laid down a pictorial mosiac of a brutal crime and, with his own confession, the involvement of petitioner in it. Evidence from an inventory search of his motor vehicle was admitted, without having been subjected to pretrial ventilation though a motion to suppress, so objection to its introduction had to be made before the jury. The confession was perhaps the most damaging piece of the picture put together in front of the jury.

The case presented by the State demonstrated guilt of petitioner. Still, Conant did not raise any sort of psychiatric defense, the only one he had. He called but a single witness in defense-the petitioner himself. The habeas court found that his "testimony was incriminatory in many respects." That testimony, particularly the portions excerpted _post,_ suggests a perverted, somewhat mocking, attitude produced the "defense" proferred: provocation by an eighty year old woman "striking" him with a cane during the encounter.

After the jury returned a verdict of guilty in less than two hours, and after the State presented its evidence during the punishment stage, Conant again called his client to the stand. Suffice it to say now that petitioner again did himself substantial damage by his performance on the witness stand. Trial counsel also presented to the jury petitioner's priest, and on _direct examination_ in response to questioning by Conant he testified that petitioner was "the type of individual who would continue upon a course of violence." Cf. Article 37.071(b)(2), V.A.C.C.P. The jury deliberated for some three hours and returned to assess petitioner the death penalty.

On September 20, 1976, Conant filed a two page motion for new trial contending, *512 _inter alia,_ that the trial court erred in admitting evidence of the inventory search of petitioner's truck, as well as in admitting his confession. He had pretermitted a pretrial motion to suppress either the fruits of the search or the confession.

The relationship between petitioner and trial counsel came to an abrupt end, and the trial court again appointed Messrs. Duke and Cantu in response to a request that Conant be removed from the case. [7] Duke and Cantu represented petitioner on direct appeal before this Court and before the Supreme Court denied his application for writ of certiorari. *Duffy v. Texas, supra*.

Though petitioner points to some twelve major failings or instances of incompetence on the part of Conant as trial counsel, we do not reach each one. For reasons more fully developed below, we hold that the abject failure of trial counsel to conduct the requisite factual and legal investigation resulted in abandonment of the only *viable* defense available and, in turn, prompted trial counsel to present a "defense" that relied on acceptance of the testimony of a client who had been diagnosed as being incapable of distinguishing between truth and falsehood and lulled him into presenting a priest who all but answered the second special issue before the jury even retired to deliberate because trial counsel did not take the time carefully to consult with him before calling him to testify. At the threshold, however, we must first deal with two other collateral problems: whether the issue of effective assistance of counsel is properly before us and the standard by which this performance by Conant must be gauged.

## II.

At the outset, we are met with the State's contention that the issue of ineffectiveness of counsel is not properly before this Court inasmuch as the issue was not raised on direct appeal. Arguing that because habeas corpus may not be used as a substitute for direct appeal, see, e. g., *Ex parte Groves, 571 S.W.2d 888 (Tex.Cr.App. 1978),* and that habeas corpus relief generally does not lie where relief could have been obtained by properly preserving the issue on direct appeal, see, e. g., *Ex parte Puckett, 274 S.W.2d 696 (Tex.Cr.App.1954),* the State invites us to apply the "Deliberate Bypass of Appellate Remedies Doctrine" employed by the Fifth Circuit. See, e. g., *Freeman v. Henderson, 507 F.2d 1229 (5 Cir. 1975).* The State even goes so far as to assert that "petitioner's counsel on appeal *deliberately* declined to raise the issue of trial counsel's competence." But an examination of *Freeman v. Henderson, supra,* reveals that the State misinterprets its holding as reflected by the following language contained therein:

> "Where the record *conclusively* and *unequivocally* demonstrates that the *accused* made a *conscious* and *intentional* waiver of his right to a thorough and careful examination of his constitutional claim on direct appeal, the denial of federal habeas corpus relief is proper...

> "Where the record of a state trial reveals a *deliberate* bypass *clearly* and *beyond doubt,* an evidentiary hearing in the federal courts as to whether there was a deliberate bypass is not required."

*Id.* at 1229-1230 [citations omitted].

Succinctly stated, this record in no way reflects that petitioner made a conscious and intentional waiver of his right to assert his Fourteenth Amendment claim derived from Sixth Amendment right.[8]

That *513 the effectiveness issue was not properly raised on direct appeal may be indicative of nothing more than the spectre of ineffective appellate counsel.[9] See, e. g., _Passmore v. Estelle, 594 F.2d 115 (5 Cir. 1979)_. The federally created "deliberate bypass" doctrine is not applicable in a State habeas proceeding such as this where a persistently complaining citizen eventually finds attorneys to question the very fairness and integrity of the factfinding process by a founded claim of denial of a right so fundamental as representation by _effective_ counsel. _Argersinger v. Hamlin, 407 U.S. 25, 29-33, 92 S.Ct. 2006, 2008-2010, 32 L.Ed.2d 530 (1972)_; _Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)_ and _Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)_ confirm the right to counsel is a fundamental one.

The State's argument must fail for another equally compelling reason. Experience has taught us that in most instances where the claim of ineffective assistance of counsel is raised, the record on direct appeal is simply not in a shape, perhaps because of the very alleged ineffectiveness below, that would adequately reflect the failings of trial counsel. Indeed, in a case such as this, where the alleged derelictions primarily are errors of _omission_ de hors the record rather than _commission_ revealed in the trial record, collateral attack may be just the vehicle by which a thorough and detailed examination of alleged ineffectiveness may be developed and spread upon a record.

Finally, as the Court noted in **_Ex parte Groves_**, supra, such judicially imposed restrictions "are not absolute," and habeas corpus is the proper forum for one unlawfully restrained of his liberty who is without an adequate remedy at law. In a context as compelling as the case at bar-where the supreme penalty has been assessed-we would be hard pressed to find that our petitioner had any other available remedy in the courts of this State. Accordingly, in the circumstances of this case we reject the State's contention that the issue is not properly before us and turn next to find the appropriate standard to determine if petitioner's claim is well taken in light of _Cuyler v. Sullivan,_ supra, and other germane authority.

## III.

The level of trial court performance of an _appointed_ criminal defense attorney accepted by the Court, though not with complete assent, is "reasonably effective assistance," **_Ex parte Gallegos, 511 S.W.2d 510 (Tex.Cr. App.1974)_**.[10] However, beginning with _Lawson v. State, 467 **S.W.2d** 486 (Tex.Cr. App.1971)_ and continuing to **_Ex parte Ewing, 570 **S.W.2d** 941 (Tex.Cr.App.1978),_** the Court looked for willful misconduct by _retained_ counsel without the knowledge of the client that amounts to a breach of the legal duty of an attorney.[11] See, e. g., _Howell v. State, 563 **S.W.2d** 933, 937 (Tex. Cr.App.1978)_; _Harrison v. State, 552 *514 **S.W.2d** 151, 152 (Tex.Cr.App.1977);_[12] _Hunnicutt v. State, 531 **S.W.2d** 618, 626 (Tex.Cr. App.1976)_.

The rationale originated in post-trial situations where retained counsel bowed out at a critical stage, leaving frustrated the right of his client to protect vital interests in further proceedings. See _Steel v. State, 453 **S.W.2d** 468 (Tex.Cr.App.1970)_ and cases from other jurisdictions cited therein. Furthermore, misconduct of retained counsel, it was then thought, could in no way be attributed to the State for Fourteenth Amendment purposes. _Lawson v. State, supra, at 488_; _Trotter v. State, 471_

**S.W.2d** 822 (Tex.Cr.App.1971); _Johnson v. Smith,_ 447 F.2d 985 (5 Cir. 1971); _Langford v. Alabama,_ 422 F.2d 760, 763 (5 Cir. 1969); _Howard v. Beto,_ 375 F.2d 441, 442 (5 Cir. 1967). Then came _Ex parte Ewing,_ supra.

Acknowledging the argument that effectiveness of retained counsel and appointed counsel should be judged by one standard, the Court examined treatment of the proposition in _Fitzgerald v. Estelle,_ 505 F.2d 1334 (5 Cir. 1974, en banc). It found the Due Process Clause of the Fourteenth Amendment standing alone and unaided by incorporation of the Sixth Amendment is violated when "ineffectiveness [of counsel] has rendered a trial fundamentally unfair, whether he be retained or appointed and whether his action or inaction was known or unknown to state trial officials." When the Sixth Amendment guarantee of assistance of counsel is implicated by State action, however, the applicable standard is the same for both appointed and retained counsel: reasonably effective assistance. And this "state action" measure "covers a greater range of counsel errors than does the fundamental fairness standard." The unanimous _Ewing_ court then concluded:

> "We agree that to secure relief for ineffective assistance of retained counsel there must also be an adequate showing of state action by failure of a responsible state official connected with the criminal proceeding [such as the trial judge or prosecutor] to take corrective action when that official had actual or constructive knowledge of retained counsel's failure to deliver reasonably effective assistance."[13]

To recapitulate, after _Ex parte Ewing,_ supra, three separate sources of effective assistance of trial counsel had been discovered:

One, the Due Process Clause of the Fourteenth Amendment, unadulterated, requires representation that attains the level of fundamental fairness-from both appointed and retained counsel.

Two, the Sixth Amendment incorporated into the Fourteenth Amendment demands "reasonably effective assistance" from appointed counsel and from retained counsel when requisite State action obtains.[14]

Three, a legal duty an attorney owes to his client is not to be breached by retained counsel nor, for that matter, an appointed counsel.

Now, however, as we have already shown _ante, Cuyler v. Sullivan,_ supra, put an end to the "double standard" emanating from the retained-appointed dichotomy. As stated by Mr. Justice Powell, the rationale is _viz:_

> "A proper respect for the Sixth Amendment disarms petitioner's contention that defendants who retain their own lawyers are entitled to less protection than defendants for whom the State appoints counsel. We may assume with confidence that most counsel, whether retained \*515 or appointed, will protect the rights of an accused. But experience teaches that, in some cases, retained counsel will not provide adequate representation. _The vital guarantee of the Sixth Amendment would stand for little if the often uninformed decision to retain a particular lawyer could reduce or forfeit the_

*defendant's entitlement to constitutional protection.* Since the State's conduct of a criminal trial itself implicates the State in the defendant's conviction, *we see no basis for drawing a distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers."*

*Id.* at <u>446 U.S. 344, 100 S.Ct. at 1716</u>.

The consequence of *Cuyler,* then, is twofold: the requisite State action is in conducting the criminal trial itself and performance of trial counsel is to be tested by the same standard whether retained or appointed. Thus, the *Ewing* formulation derived from <u>*Fitzgerald v. Estelle*</u> is satisfied without any showing of State action through inaction of a responsible State official connected with the criminal proceeding. All that remains is application of the "reasonably effective assistance" test under the Sixth Amendment incorporated by the Fourteenth-if that is still the test.

<u>*McMann v. Richardson,* supra</u>, has led one member of this Court to an undifferentiated standard of "reasonable competence demanded of attorneys in criminal cases," **<u>Ex parte Gallegos, supra, at 513-514</u>**. Some five federal judicial circuits and ten states have adopted the "reasonable competence" test. See Erickson, "Standards of Competency for Defense Counsel in a Criminal Case, 17 Am.Crim.L.Rev. 233, 239-240 at nn. 57-58 (1979).

Perhaps sensing this "reasonable competency by community standards" test and its increasing popularity among state and federal appellate courts, able counsel for the petitioner produced and included in our record offers of proof from some eight criminal defense practitioners in Bexar County, comprising an array of outstanding legal talents in that county, indeed in this State, that in their opinion, based upon his revealed conduct in this case, Conant did not render reasonably effective assistance of counsel, did not fulfill his legal duties to a client on trial for the offense of capital murder, and did not meet the minimally acceptable standard of legal assistance in the Bexar County community for such a case.[15]

The State, in brief and at oral argument, proposed its own standard for effectiveness under <u>*Cuyler v. Sullivan,* supra</u>: whether counsel, in the course of his representation of a criminal defendant, engages in willful misconduct or gross negligence that substantially prejudices the accused's cause. The State goes on to define "gross negligence" as a "conscious indifference to the defendant's cause resulting in failure to exercise reasonable diligence in the course of the representation of the defendant." State's Reply Brief at 8. We reject the State's proposal for it is but a throwback to the "breach of duty" notion that has been untenable as an exclusive measure for effectiveness of retained counsel since **<u>Ex parte Ewing, supra</u>**. Moreover, though vague, the touchstone of <u>*Cuyler v. Sullivan,* supra</u>, is "adequate representation," and it immediately occurs that performance by trial counsel may well be "inadequate" through acts of commission or omission less reprehensible than willful misconduct or gross negligence. The result in such cases would be a tacit sanctioning of representation that falls below the Sixth Amendment standard but does not amount to a breach of legal duty. What the State proposes seems more appropriate for assaying a pure *516 Fourteenth Amendment guarantee of fundamental fairness vouchsafed by its Due Process Clause, and as we view the instant assertions of ineffective assistance of counsel a greater range of counsel errors is invoked.[16]

*Ex parte Ewing, supra*, is barely two years old and *Cuyler v. Sullivan, supra*, not even a toddler. Until further experience teaches otherwise we will apply here and continue to use the standard of "reasonably effective assistance of counsel" to test adequacy of representation afforded an accused by retained as well as appointed counsel when the performance is to be judged by the Sixth Amendment right to assistance of counsel made applicable to the states by the Fourteenth Amendment-also by our own "right to be heard" provision of Article I, Section 10, Bill of Rights, Constitution of Texas.[17]

# IV.

## A

A criminal defense lawyer must have a firm command of the facts of the case as well as governing law before he can render reasonably effective assistance to his client-in or out of the courtroom. *Flores v. State, 576 S.W.2d 632, 634 (Tex.Cr.App. 1978)*; *Ex parte Ewing, supra, at 947*; see also *Herring v. Estelle, 491 F.2d 125, 128 (5 Cir. 1974)*; *Caraway v. Beto, 421 F.2d 636, 637 (5 Cir. 1970)*; *Williams v. Beto*, 345 F.2d 698, 705 (5 Cir. 1965). In the seminal decision of *Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)*, the Supreme Court recognized that a thorough factual investigation is the foundation upon which effective assistance of counsel is built:

> "It is not enough to assume that defense counsel thus precipitated into the case *thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts. No attempt was made to investigate.*"

> 287 U.S. at 58, 53 S.Ct. at 60, 77 L.Ed. at 165.

*517 An American Bar Association Project echoes these sentiments in proposing that:

> Defense counsel has the responsibility to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's information or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty.

ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and Defense Function § 4.1 (Approved Draft 1971).

The Court recently reiterated that regardless of complications in a given case, counsel is charged with making an *independent* investigation of the facts of the case, *Flores v. State, supra*, eschewing wholesale reliance in the veracity of his client's version of the facts, *Ex parte Ewing, supra, at 947*. See also *Rummel v. Estelle, 590 F.2d 103, 104 (5 Cir. 1979), affd. on other grounds*, 445 U.S. 263,

100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (counsel must make an independent examination of the facts, circumstances, pleadings and laws involved).

A corollary of this notion is that counsel also has a responsibility to seek out and interview potential witnesses, see, e. g., _Davis v. Alabama, 596 F.2d 1214, 1217 (5 Cir. 1979); Harris v. Estelle, 487 F.2d 1293, 1299 (5 Cir. 1974);_ _Williams v. Beto,_ supra at 702-703, and failure to do so is to be ineffective, if not incompetent, where the consequence is that the only viable defense available to the accused is not advanced. See _Brooks v. Texas, 381 F.2d 619, 625 (5 Cir. 1967)_ and _Smotherman v. Beto, 276 F.Supp. 579, 590 (N.D.Tex.1967)._

In light of these authoritatively declared duties and responsibilities, we first reproduce verbatim in the margin what _Conant_ says he did by way of preparation for trial[18] and then point out and discuss that which he did not do.

Among the papers on file was the written request made by initial counsel for an independent psychiatric examination of petitioner in which prior commitments under the care of Dr. George Schlagenhauf were mentioned. Mr. **Duffy** called the prospective witness and his availability to the attention of Conant on more than one occasion before trial. Conant did not contact or interview or examine any records maintained by Dr. Schlagenhauf. Indeed, at the evidentiary hearing, he was "not sure if I recall that name."

Neither did trial counsel bother to contact or confer with two other potentially valuable defense witnesses, petitioner's former fiancee and one W. W. McCord. The first had been interviewed by the investigator for petitioner's court appointed attorneys as well as counsel for the State, yet inexplicably not by Conant. The woman expressed a desire to testify at trial on the issue of whether petitioner's confession was in fact voluntary and advised trial counsel of this desire. When asked at the habeas hearing why he did not call her to testify at trial, trial counsel refused to give any answer at all. McCord was a police officer who had *518 befriended petitioner and helped him get a job. The officer indicated to petitioner's parents his willingness to testify favorably regarding petitioner's character; they in turn passed this information on to Conant, but he did nothing with it.

With respect to interviewing State's witnesses, neglect infected that responsibility. It was stipulated at the habeas hearing that Conant did not contact or interview any of the twelve witnesses called by the State. While he testified that he had contacted Bill White of the Bexas County Sheriff's Office, the parties stipulated that White would testify otherwise if called. But trial counsel testified and the State contends that the failure to interview its witnesses was harmless because the State "opened its file" to trial counsel. Accordingly, said trial counsel, "I didn't think it was necessary to file a Brady versus Maryland motion." Trial counsel stated that he did not obtain statements from any of the witnesses in this case because he made notations from written statements of the witnesses to which he had access in the sheriff's department.[19] He first announced ready on July 12, 1976, notwithstanding the fact he had not yet conferred with either prosecutor in charge of this case. Though Conant was sure that he had talked with Mr. Harris, co-counsel for the State, _before_ July 12, Harris testified otherwise, and his file bears him out. It was impossible for Conant to determine just what quantum of

investigation he conducted or what degree of factual information he possessed because as soon as he was discharged by the Duffys he discarded his entire file.

Neither did trial counsel confer with his client in a manner consistent with the gravity of the case he was called upon to defend. It was developed at the habeas hearing that according to the Bexar County Jail "sign-in logs," Conant visited with his client only *twice* from June through September of 1976, the period of his tenure as retained counsel.[20] The State replies with the assertion, citing *Loftis v. Estelle*, 515 F.2d 872 (5 Cir. 1975) and *Daughtery v. Beto*, 388 F.2d 810 (5 Cir. 1967), that "mere brevity of consultation *alone* is insufficient to establish a violation of the Sixth Amendment right to effective counsel." State's Brief at 12. But this record reflects a great deal more than "mere brevity of consultation" and, consequently, the reasoning of *Loftis* and *Daughtery* is inapposite.

Finally, we note that Conant admitted he did not visit the scene of the crime. See Friloux, The Defense View: Pre-trial, at 7, Selected Materials on Trial Practice, National College for Criminal Defense (May, 1979).

In sum, we are unable to find any endeavor worthy of being denominated "an independent investigation of the facts of the case" demanded of competent criminal defense lawyers by this Court in, e. g., *Flores v. State*, and **Ex parte** *Ewing*, both supra.

## B

It is well settled that an attorney has a professional duty to present all available evidence and arguments to support the defense of his client. *Thomas v. State*, 550 **S.W.2d** 64, 68 (Tex.Cr.App.1977). In the *519 case at bar, however, this record glaringly reflects that trial counsel failed to advance an insanity defense or in any other way make use of psychiatric evidence available to him. As is so often the case in those situations where a psychiatric defense, or for that matter any viable defense, has not been raised, the dereliction is because the attorney is not familiar with the defense or, if he is, has not adequately investigated the facts of the matter.[21] See, e. g., *Brooks v. Texas*, 381 F.2d 619 (5 Cir. 1967) (insanity); *Smotherman v. Beto*, 276 F.Supp. 579 (N.D. Tex.1967) (insanity); *United States v. Fessel*, 531 F.2d 1275 (5 Cir. 1976) (insanity); *Gomez v. Beto*, 462 F.2d 596 (5 Cir. 1972) (alibi). That this situation is present in the instant case is clear.

As noticed earlier, original court appointed attorneys for petitioner filed a motion requesting the appointment of a psychiatrist at State expense in an attempt to develop an insanity defense as well as to test competency to stand trial. But after Conant replaced them, no further mention of or reference to such a motion is found in the record. We are left with the impression that Conant did not discuss with the lawyers he succeeded their formulation of possible defenses, did not obtain his client's file from them nor examine the court file. But it is undisputed that petitioner's father informed Conant that his son had been under the care of Dr. George Schlagenhauf, at the Villa Rosa medical facility in Bexar County for over a year. Yet trial counsel did not contact, interview or attempt to secure Schlagenhauf's attendance at the trial. "[A]n attorney for an accused must use all diligence in

securing evidence on the issue of insanity," _Sharp v. State,_ 392 **S.W.2d** 127, 128 (Tex.Cr.App.1965), and it may depend upon how easily evidence may be secured.

At the hearing below, Dr. Schlagenhauf testified that petitioner's mother was a nurse at Methodist Hospital where in making his rounds he came to know her; once she took the occasion to ask him to see her son. After a number of visits with him, Schlagenhauf came to the opinion that petitioner should be hospitalized, and on December 17, 1971, petitioner voluntarily committed himself to the Villa Rosa psychiatric facility where he stayed for six weeks. On at least two later occasions, the doctor noted, petitioner committed himself, again voluntarily, to the Villa Rosa facility for six week periods during the summer of 1972. After learning petitioner had been arrested for the offense of capital murder, Schlagenhauf felt sure that "somebody would call me" in regards to his past medical history. Shortly thereafter, Cliff Ross, a court appointed investigator, did contact him on or about March 23, 1976, at the instance of Messrs. Duke and Cantu. Denied the opportunity to testify at the trial because Conant did not follow through, the doctor attested at the habeas hearing what he would have testified to at the trial, in pertinent part:

> Q [By Mr. Goldstein]: You didn't see any serious assaultive tendencies in [petitioner] at that point?
>
> A: Quite to the contrary. Joe was always a very gentle sort of fellow.
>
> Q: And whether he knew the difference between right and wrong, individuals in this state may have, on occasion, _difficulty or an inability to conform their conduct because of their inability to deal with these situations?_
>
> A: _Uh-huh._
>
> Q: _Because of the mental state of the problem they are having, the personality disorder—_
>
> A: _That is true._
>
> Q: _And had Mr. Conant contacted you at the time of the trial in 1976 would you have been able to tell him about Joe's gentle personality and about his inability to tell the difference between right and wrong?_
>
> *520 A: _Yes._[22]

The Fifth Circuit has repeatedly stressed the "particularly critical interrelation between expert psychiatric assistance and minimally effective representation of counsel." _United States v. Fessel,_ 531 F.2d 1275, 1279 (5 Cir. 1976). Indeed, where, as here, trial counsel fails to request the appointment of a psychiatrist at State expense, especially when evidence of guilt is virtually uncontested and the only defense issue for development is the sanity of the accused at the time of the offense, trial counsel has been ineffective. _United States v. Fessel,_ supra. The language of Fessel is nicely instructive in explicating why trial counsel there, as here, has not met the mark posed by the Sixth Amendment:

"In the instant case, there could be little doubt as to the appropriateness of an insanity defense and the need for psychiatric assistance to prepare it. The evidence showing Fessel guilty of committing the acts charged was virtually uncontested. *The only issue for the jury to consider therefore was the sanity of the defendant at the time of the offense.* In the absence of live psychiatric testimony favorable to the defendant, the need for a... motion [requesting the appointment of a psychiatrist] was manifest. In these circumstances, we hold that the failure of [trial] counsel to utilize [the appointment of a psychiatrist at public expense] denied the accused services necessary to the preparation and presentation of an adequate defense, and thus denied him the minimally effective representation guaranteed by the Sixth Amendment."

*Id.* at 1279.

See also *Brooks v. Texas*, supra; compare *Faz v. State*, 510 **S.W.2d** 922 (Tex.Cr.App. 1974) and *Coble v. State*, 501 **S.W.2d** 344 (Tex.Cr.App.1973).

Even without a court appointed psychiatrist, Conant had been told of a history of commitments and knew of the availability of Dr. Schlagenhauf. In similar circumstances the Fifth Circuit has recently found in *Davis v. Alabama*, 596 F.2d 1214, 1218 (1979):

"Not only did the defense attorneys know that insanity was *a* possible defense; they apparently knew it was Davis's only possible defense. Thus their failure to investigate cannot be excused by saying that it did not seem to be a very strong defense. In deciding not to develop the insanity defense Davis's attorneys effectively decided to put on no defense at all. We cannot say that such an approach amounts to adequate representation." [Emphasis in original]

and, after reviewing more of the record, held, *id.* at 1219:

"... Still they made no effort to investigate or develop the possible sources of evidence. This is not a borderline case; it is a clear breach of the duty a defense attorney owes to his client."

In *Smotherman v. Beto,* supra, where failure to develop the facts resulted in presentation of nothing more than a *pro forma* insanity defense, it was written:

A lawyer attends a professional school for 3 years; he is instructed in a myriad of legal theories, rules and rationales, all of which are designed to achieve but one end: the development of a searching, inquisitive and analytical mind ... *The lawyer who does not probe, does not inquire, and who does not seek out all the facts relevant to his client's cause is prepared to do little more than stand still at the time of trial."*

*Id.* at 588.

The State advances the contention, however, that the failure to develop and assert *521 the defense of insanity was excusable and did not prejudice petitioner because it was a tactical or strategic

decision of trial counsel. See, e. g., *Ex parte Parker*, 485 **S.W.2d** 585 (Tex.Cr.App.1972); *Faz v. State*, supra; *Daughtery v. Beto*, supra. Since the State makes the similar contention with respect to other failings, discussion and disposition of the contention is reserved until we get to the findings and conclusions of the habeas court *post* under Part V.

The State also advances the correlative contention that even if counsel had elected to assert an insanity defense, the evidence adduced by the State would have rendered it unavailing.[23] But this attitude ignores applicable law. The California Court of Appeals spoke to this exact same contention in the Juan Corona case, *People v. Corona*, 145 Cal.Rptr. 894, 911-12, 917-18, 80 Cal. App.3d 724 (1978), and its reasoning is equally applicable to the instant case:

> "The very vice of the procedure followed by trial counsel was his failure to properly investigate and develop facts which could have or would have given rise to the defense in question [insanity]. Also, since the facts remained uncovered and undetected, there is no way of telling whether those facts, if fully developed, would or would not have established the defenses in dispute. If the record on appeal is defective or incomplete, it is due solely to the neglect of trial counsel. *At any rate, the test of whether a criminal defendant was accorded an adequate legal defense does not depend on the potential success of the defense omitted, but rather on the consideration whether the defense withdrawn from the case was a crucial one ...*
>
> *"In such circumstances we may not save the judgment by speculating whether the defense would have been successful;* regardless of the apparent strength of the prosecution's evidence, a trial in which only one side of the case is heard is `fundamentally unfair' and hence constitutes a denial of due process of law. Such a conviction cannot stand."

*People v. Corona*, supra, at 917-918 (citations omitted).[24]

Furthermore, even if speculation reduced the strength of an insanity defense, such matters about which Dr. Schlagenhauf was prepared to testify would have been relevant in mitigation of punishment. See *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), confirming the now familiar concept that in capital murder cases the jury must be permitted to consider all aspects and the character and record of the accused as well as circumstances of the offense.

Having dealt at this point with errors of omission as they related to his failure adequately to investigate the facts, we turn lastly to a discussion of how this failure contributed to a pair of critical errors of commission: the ill-fated testimony of the petitioner and his priest.

C

*[handwritten: GUILT/INNOCENCE]*

At the "trial" on the merits, petitioner's entire defense was presented by but one witness: himself. At the habeas hearing below, it was developed that until Friday of the first week of trial, petitioner was

receiving a daily dosage of 100 milligrams of mellaril, a potent tranquilizer. Trial counsel had not learned his client was being medicated when he made the decision to put the petitioner on the stand.

*522 Conant was also singularly unaware of petitioner's manifest inability to distinguish between truth and falsehood.[25]

And so, without any of this information that was readily available to him had he conducted the most cursory factual investigation, Conant implemented his "tactical decision" to place his client on the stand. Totally unaware of Dr. Schlagenhauf's diagnosis that "[petitioner's] manner of relating... is so eloquent and superficially genuine that *Joe projects a facade of being a victim of circumstances,"* trial counsel led his client through a story premised on the "defense" that he had been provoked by the eighty year old victim when she struck him with a cane.[26] Yet probably the most damaging testimony out of petitioner's own mouth, totally consistent with Dr. Schlagenhauf's analysis that petitioner was "unable to tell the truth without meaning not to tell the truth," was his "denial" of stabbing the victim more than three times:

> "Q: Did you go there to take anything from her?
>
> A: No, sir, I did not. I told that to Detective Bill White... *He kept wanting to know what happened to the other seven wounds.*
>
> Q: What did happen to them?
>
> A: *I don't know.* He kept telling me 'Well, what happened to them? Where are the other seven.' *I told him I didn't do it."*

That the prosecutor was ready, willing, and able to wreak additional havoc on petitioner's "testimony" is more than amply illustrated by the following colloquy:

> Q [By Mr. Conaway]: That is what you said. You are savage enough to sit there and tell this jury you stabbed her three times, you are that savage, aren't you?
>
> A: No audible answer.
>
> Q: Are you?
>
> *523 A: *I am not what you would call it that savage or not.*
>
> Q: Savage enough?
>
> A: I am saying that I stabbed her three times. *I don't know where the other seven went.*
>
> Q: You don't know where the other seven went?
>
> A: *I don't have any idea.* I have stated that from the beginning.

Q: All right. Well, do you suppose that after you stabbed her three times and left someone else came in and stabbed her seven times. *Do you think that anyone is going to believe that, Harvey?*

A: I really don't know. *I hope so because I didn't do it.*

Q: You are just going to sit there and admit stabbing her three times, that's all?

A: *What other defense do I have ...*   ✓ *PUNISHMENT*

Testimony given by petitioner at the punishment phase reveals an attitude entirely predictable from the psychological profile drawn by Dr. Schlagenhauf, *viz:*

Q [By Mr. Conant]: How do you feel about killing Mrs. Word?

A: I really don't know how to express how I feel...

Q: How do you feel about it?

A: I am sorry for the offense that I did. I don't know how else I can put it. I know what all the things that happened to me, *I know the condition that I was in. I still don't believe that I did it. I still don't know how that I did it.*

Q: But you know that you did it?

A: *I said that I am not a savage person. I simply don't know how I did it.*

Predictably, the prosecutor capitalized on that attitude, as follows:

Q [By Mr. Conaway]: Why did not you make some effort, since you are so remorseful now-after you have been convicted-why did not you make some effort at the time to do something to help the woman?

A: I simply don't know.

Q: But you sure won't do it again, would you?

A: No, sir; I would not.

Q: You are sorry you murdered her, sorry you stabbed her ten times?

A: *I didn't stab her ten times.*

Q: *You still want to argue about that?*

A: *No audible response.*

Also during the punishment phase, after the State had introduced evidence of five prior felony convictions (none of which involved crimes against the person), trial counsel called Father Joseph Leroy Manning to persuade the jury that petitioner would not continue upon a course of violence. Cf.

Article 37.071(b)(2), V.A.C.C.P. ("whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society"). The record then reflects the following exchange:

Q [By Mr. Conant]: All right, sir. Do you feel that you know the defendant, Mr. **Duffy**?

A: As well as I know any human being.

Q: All right, sir. That is fair. *In your opinion do you feel that Mr. Duffy is the type of individual who would continue upon a course of violence?*

[State's objection overruled]

Q: *Do you feel that, sir?*

A: *Yes, sir. You said continue on a course of violence.*

Q: Yes, sir.

*at "trial"*

Though the witness attempted to qualify his affirmative answer by noting that "he was very surprised to learn of the charges against [petitioner] because from my association with him I had detected no indication of violence," it would be hard to imagine a more damaging piece of evidence *elicited on direct examination by the petitioner's own counsel* calculated to convince the jury that this petitioner should be awarded the death penalty. See *Duffy v. State, supra at 208*. Even a minimally cautious attorney would have taken steps to prevent this occurrence. *524 That this counsel did not is explained by the testimony of Father Manning at the habeas hearing below:

Q [By Mr. Goldstein]: Father, did you have—did you know his-the defense attorney Joel Conant?

A: No.

Q: Had he ever come and interviewed you or asked you any questions with regard to this case.

A: To the best of my recollection we talked for a few minutes. He put me on the stand during the course of the sentencing hearing, and he talked to me a few minutes before that and I don't even recall anything of the conversation.

Q: All right. *Did he ever really ask you what you were going to say when he put you on the stand?*

A: *Not really. No.*

* * * * * *

Q: And he never bothered you to ask you about ... what you might say at a punishment stage when that is one of [sic] critical issues they might ask you?

*The State's Attorney (Ann Moves) would likely characterize such lengthy "off limits" quotations from the Trial Record as mere "snippets" taken out of context and dismiss them out of hand —*

A: *He did not probe at all.*

The cause, then, for this harmful "surprise"[27] by Father Manning is utter failure on the part of trial counsel even to discuss with credentialed and otherwise impressive witness what his response would be to a question going to the heart of one of three issues the jury must decide. "Witness preparation is vital to an effective defense presentation," Moses, Criminal Defense Sourcebook 55, § 3.08 "Advice to Prospective Witnesses."

The State replies that in calling Father Manning to the stand Conant was following the trial strategy of presenting witnesses to convey the idea that petitioner was not a violent person and, in any event, there is no reasonable possibility that the jury verdict would have been different had Father Manning not testified as he did. Of course, that trial counsel would adduce proof touching on the second special issue to be answered by the jury is to be expected of competent counsel. If he did not do so, his very ability to function as a trial lawyer in a capital case would be called into question. That he did so, therefore, is not so much a matter of trial strategy as it is a mandate from the law of the case on trial. The vice flowing from his attempt to carry out that mandate originated, however, in his cavalier preparation of the witness at the punishment stage of trial. When a Catholic priest testifies to a Bexar County jury, members of his faith, we are sure, will be most attentive.

Finally, the State's argument that "there is no reasonable possibility" that the death sentence would not have been imposed absent Father Manning's testimony flies in the face of the Supreme Court's holding in *Chapman v. California*, 386 U.S. 263, 87 S.Ct. 229, 17 L.Ed.2d 705 (1967) and its progeny. Explicating its holding in *Chapman,* the Supreme Court in *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) held that the error in admitting or excluding evidence is harmless if an average jury *"would not have found the State's case significantly less persuasive"* had the complained of evidence been admitted or excluded. Viewing the State's case during both the offense and punishment phases of the trial in the entirety, we are compelled to hold that its case would in fact have been significantly less persuasive had Father Manning not testified as he did or, for that matter, had the petitioner himself not testified in the manner alluded to above. In a case such as this where the petitioner has been condemned to death, we believe that effective assistance of counsel is a "constitutional right so basic to a fair trial that [its] infraction can never be treated as harmless error." *Chapman v. California,* 386 U.S. at 23, 87 S.Ct. at 827-828, 17 L.Ed.2d at 710. See also *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *White v. Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Powell v. Alabama,* supra.

Tainted at the start by solicitation, errant in investigative method, unheeding of directions to available germane witnesses, slothful in preparation for and unexplainable in conduct at trial, assistance of counsel in this case was never effective-findings of the habeas court to the contrary notwithstanding.

## V.

Finally, there is the matter of the habeas court's findings of fact and conclusions of law filed on June 4, 1979, in which it is recommended that relief be denied. Of course, this Court is not bound by the

findings of the habeas court in a post-conviction habeas corpus proceeding. *Ex parte Harris*, 593 **S.W.2d** 330 (Tex.Cr.App.1979); *Ex parte Cantrell*, 571 **S.W.2d** 33 (Tex.Cr. App.1978); *Ex parte Rains*, 555 **S.W.2d** 478 (Tex.Cr.App.1977). In concluding that performance of counsel did not fall below that standard mandated by the Sixth Amendment through the Fourteenth, the habeas court found as a "fact" that:

> "Such counsel, in this case ... seemed to follow the *tactic* in the case of attempting to save the defendant from the death penalty, *to the exclusion of preserving legal points at the time.* Under the circumstances of this case, *this may not be an unreasonable approach. At any rate the trial was not a farce or mockery of justice in any sense of the word."*

As indicated *ante,* for its part the State insists that what might be viewed as failings of trial counsel, as we have, are in realty the consequences of trial strategy or tactical decision. We have not addressed the matter of a strategy that rules out "preserving legal points" in this capital case, but do examine it in the margin to provide the setting for evaluating the contentions made by the State.[28]

*526 Whether counsel's failure to assert psychiatric defenses was a strategic decision begs the question. It may not be argued that a given course of conduct was within the realm of trial strategy unless and until the trial attorney has conducted the necessary legal and factual investigation which would enable him to make an informed, rational decision. See *Powell v. Alabama, supra at 58*, 53 S.Ct. at 60, 77 L.Ed. at 165; see also *People v. Corona, supra*. Abdication of basic threshold responsibility is the antithesis of a considered strategy to assert or withhold possible defenses. Thus, Conant withdrew psychiatric defenses and mitigating testimony on punishment before he had even examined them.

Though it might be argued that the uninformed decision to place the petitioner on the stand at the offense and punishment stages was a ploy which in hindsight we may not criticize, this argument must also fall. It blinks reality to find that a reasonably effective trial lawyer would, as a matter of tactics in a capital case, decide to put his client on the stand, waive the privilege against self-incrimination, subject him to a potentially brutal cross examination-all without taking the trouble to find out that his client is incapable of telling the truth or that he is being given a massive dosage of a potent tranquilizer which could not help but make a bad situation worse. We will not balance the rights of a maladaptive, possibly insane, twenty five year old accused against convenience of a mature retained attorney, nor condone his brinksmanship in an area that he has not explored for dangers that are there. See *Davis v. Alabama, supra, at 1221*.

Surely at some point "tactic" becomes an unsatisfactory justification for ineptness. And where silence which results in waiver of potentially reversible error in almost all respects cannot be explained by the practitioner, we are not warranted in excusing his major derelictions. The justifications advanced by the State-in its own hindsight-must be rejected. Ineffectiveness disguised as strategy ultimately unmasks itself.

The second conclusion of law made by the habeas court reads in its entirety:

"Recent rulings of the Court of Criminal Appeals held that where the Petitioner hired a counsel to defend him in a criminal case, he cannot contend that he was represented by ineffective counsel. *The rule may be otherwise if the trial is a farce or a total miscarriage of justice,* which this trial was certainly not."

We know not to which "recent rulings" the habeas court had in mind on June 4, 1979 when reaching that legal conclusion, but the "farce and mockery" gauge has not been recognized as the correct standard for *appointed* counsel in this State since 1967, see *Caraway v. State*, 417 **S.W.2d** 159 (Tex. Cr.App.1967),[29] and has *never* been the correct test for gauging effectiveness of *retained* counsel-until *Ewing, supra*, it was "breach of a legal duty."

## VI.

In *McMann v. Richardson, supra*, the Supreme Court insisted:

"[I]f the right to counsel [as] guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel..."

397 U.S. 759, 771, 90 S.Ct. at 1449, 25 L.Ed.2d at 773.

A decade before, Judge Davidson for the Court presaged this sentiment when he wrote:

"[W]hen from the entire record is is apparent that the accused has not been adequately represented the court should have no hesitancy in so saying."

*Rodriquez v. State*, 340 **S.W.2d** 61, 63 (Tex. Cr.App.1960).

We are not unmindful of the brutal offense which the evidence amply shows this petitioner committed. But the only issue before us at this juncture is whether this *527 petitioner was "left to the mercies of incompetent counsel," incompetent in the sense that his purported assistance was unreasonably ineffective. Because this petitioner is so situated, this conviction and concomitant death penalty cannot stand, and it falls to us to say so. To hold otherwise would be, in the words of Justice Sutherland, "to ignore the fundamental postulate... that there are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard." *Powell v. Alabama*, 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158, 172 (1932).

Accordingly, the relief sought is granted and conviction and assessment of death in Cause No. 76-CR-840 are set aside; the petitioner is hereby remanded to the custody of the Sheriff of Bexar County to answer the indictment in the case. A copy of this opinion will be forwarded to the Texas Department of Corrections.

It is so ordered.

ONION, P. J., and DOUGLAS, ODOM, TOM G. DAVIS, DALLY and W. C. DAVIS, JJ., concur in result.

[1] All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

[2] Part III is a unanimous holding by the Supreme Court, speaking through Mr. Justice Powell; Justices Brennan and Marshall, though writing separate concurring opinion, expressly joined in this part.

[3] In the margin by way of further explication, Mr. Justice Powell quoted approvingly from *United States ex rel. Hart v. Davenport,* 478 F.2d 203, 211 (3 Cir. 1973):

"A rule which would apply one fourteenth amendment test to assigned counsel and another to retained counsel would produce the anomaly that the non-indigent, who must retain an attorney if he can afford one, would be entitled to less protection .... The effect upon the defendant —confinement as a result of an unfair state trial —is the same whether the inadequate attorney was assigned or retained."

Thus, while the claim being addressed was that the federal habeas corpus action had no bottom because "the conduct of retained counsel does not involve state action," both the text and footnote 9 demonstrate that demolishing the prior dichotomy produces a broader effect.

[4] Here and generally throughout the phrase is used generically unless in context a more discrete meaning is evidently intended.

[5] A fuller exposition of the facts of the offense and its aftermath appears in *Duffy v. State, supra, at 207-208,* and a reading of the complete opinion there will provide a setting for this one. What we propose to do here is, first, to outline the attorney-client relationship and to summarize what followed, editorializing somewhat in the interest of brevity; then each significant failing of counsel and its particular facts will be discussed; finally we will address certain findings of fact and conclusions made by the habeas court.

[6] This contention was rejected on petitioner's direct appeal on the grounds that trial counsel voiced no objection to the proceedings or the jurors at any time during the course of the trial thereby permitting a presumption of regularity to rule adversely to petitioner. *Duffy v. State, supra at 200-201.*

[7] The record at the motion for new trial hearing reflects that petitioner strenuously objected to the continued representation by Conant. The basis was Conant's failure to confer with him or otherwise represent him adequately. Petitioner did the best he could to bring the matter to the attention of the trial court-to the point of a near physical altercation with Conant in the presence of the trial judge, so we are told-and we do not know what opportunities he had thereafter to reiterate his extreme resentment toward Conant and his conduct of the case. Presumably he had been promptly transferred to death row at the Texas Department of Corrections.

[8] Beginning at least with the anxious letter petitioner wrote to the trial judge, quoted verbatim *ante,* and the stormy scene preceding a scheduled hearing on motion for new trial, that petitioner was insisting on his right to effective assistance of counsel was evident to anyone aware of the events. Nothing before us indicates that petitioner ever wavered in the belief that Conant had ill-served him and his cause.

[9] See *Duffy v. State, supra, at 200,* note 1, for an account of the oral profession by appellate counsel of ineffective assistance on appeal in failing to file an amended motion for new trial upon leave of the trial court to do so after the notes of the court reporter had been transcribed. That record, though, could not enlighten an appellate attorney as availability of prospective witnesses who were not called or existence of medical records that were not examined. By that time in July of 1977 one is permitted to surmise that petitioner had been transferred to and confined on death row, making direct communication with him somewhat difficult; we are not informed whether appellate counsel made the effort.

[10] Judge Roberts, joined by Judge Odom, would expect "reasonable competence demanded of attorneys in criminal cases," drawing that standard from *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

[11] Along the way, dissenting in *Ewing v. State,* 549 **S.W.2d** 392, 396 (Tex.Cr.App.1977), Judge Roberts argued that there should be no distinction in demanding of retained and appointed counsel alike the reasonable competency performance he advocated in *Ex parte Gallegos, supra.*

[12] In dissent Judge Roberts reiterated that both retained and appointed counsel, without distinction, "should be reasonably competent, and neither should render inadequate representation." This time Judge Phillips joined him.

[13] From this formulation it follows that until denial of reasonably effective assistance of retained counsel is demonstrated the requirement of State action need not be examined. *Ex parte Ewing, supra, at 948*.

[14] Fully stated, the test for effective counsel is "counsel reasonably likely to render and rendering reasonably effective assistance," *McKenna v. Ellis*, 280 F.2d 592 (5 Cir. 1961) as quoted approvingly by the Court in *Caraway v. State*, 417 **S.W.2d** 159, 162 (Tex.Cr.App.1967).

[15] Such defense attorneys included:

(1) Terrence W. McDonald, Professor of Criminal Law, St. Mary's University School of Law in private practice with Nicholas and Barrear, Inc.;

(2) Pat Priest, private practitioner;

(3) John Hrncir, former Bexar County Assistant District Attorney;

(4) Warren Weir, former U.S. Attorney;

(5) Sam Bashara, private practitioner;

(6) Charles Butts, private practitioner and current President of the San Antonio Bar Association;

(7) Fred Semaan, private practitioner; and

(8) Antonio Cantu, former Assistant Criminal District Attorney.

[16] The State also would have it that "[t]he fact that petitioner's counsel solicited [the] case while petitioner was in the Bexar County Jail... is irrelevant to the issue of effectiveness..." Yet, the solicitation in this case dramatically underscores the point made by Mr. Justice Powell in *Cuyler v. Sullivan,* supra: "The vital guarantee of the Sixth Amendment would stand for little if *the often uninformed decision to retain a particular lawyer* could reduce or forfeit the defendant's entitlement to constitutional protection." Our prohibition against solicitation, State Bar Rules, DR 2-103(A), is premised in part on the thesis that initial misconduct in obtaining the client is a harbinger of "potential harm to the solicited client in the form of overreaching, overcharging, underrepresentation, and misrepresentation," *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 461, 98 S.Ct. 1912, 1921, 56 L.Ed.2d 444 (1978). Thus, that Conant "rustled" the client from appointed counsel is not completely irrelevant to the issue of adequacy of his ensuing representation, for certainly it marks the beginning of the "totality of the representation [afforded] the accused," *Ex parte Ewing,* supra. Solicitation also tends to belie the erstwhile conventional wisdom that simply because he is retained an attorney is not likely to engage in willful misconduct that amounts to a breach of his legal duty to his client and keep it from his client, *Lawson v. State,* supra, and the initial tainted feature of the attorney-client relationship, in turn, bears on the performance level demanded of what we may call a "self-appointed" counsel. If there are the harms potentially inherent in the solicited relationship that the *Ohralik* court found, damage that is inflicted by the soliciting attorney, though foreseeable in one sense, was hardly anticipated by the unsuspecting solicited client, and relief should not be precluded by resort to a higher standard of misconduct applied to properly retained counsel. In sum, that the client has been badly served from the outset coupled with some other failing produces a synergism that more acutely flaws the overall performance of the soliciting attorney.

[17] The "reasonable competence" test proposed by our Brother Roberts lacks appeal at this time for the language of the Supreme Court was spoken in a context of advice of counsel that his client enter a guilty plea. Our concern here is with a much broader course of conduct than counselling a plea; we must judge a full scope of "assistance"-representation, performance, delivery-for effectiveness rather than adequacy of ability or capacity to advise. The standard we retain mandates an examination both of competence, "likely to render," and of assistance, "and rendering," in determining effectiveness of counsel.

[18] At the evidentiary hearing and without elaboration as to their content, except his discussions with prosecutors were primarily in the nature of plea bargaining, when asked to tell what he did by way of preparation Conant answered:

"A: I had several conferences with Mr. Bill Harris. I think one conference with you, and two or three conferences with Mr. Bill White, I believe, is his name, he is a deputy sheriff who was in the investigative division of the sheriff's department here, wherein he opened up his file to me and showed me all the statements of the witnesses that-or possible witnesses that the State would have. I made notations from those, went over the search warrant and with the information I had gained from the states [sic] file I went back and discussed these matters on numerous occasions with Mr. **Duffy**."

We are constrained to remark that Conant could not have gone over "the search warrant" for the incriminating materials admitted during trial were obtained from an "inventory search" conducted by Bexar County officers in Fredricksburg, Gillespie County.

[19] Since completeness and accuracy of any prior written statement of a prospective witness depend in part on the skill of the person taking it in directing questions and recording answers, it is not necessarily determinative of all relevant information stored away in the mind of the affiant. Thus, the careful and cautious defense investigator will directly explore every nook and cranny for some unwritten recollection, whether it be helpful or harmful to his client. Moses, Criminal Defense Sourcebook 51.

[20] It being inherently prejudicial for a trial court to prohibit overnight consultation between attorney and client, *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), the Fifth Circuit has indicated that prejudice need not be shown before an attorney is held ineffective for failing to consult adequately with his client, *Davis v. Alabama,* supra, at 1223. The infrequency of consultation, given the nature of this cause, suggests another shortcoming of trial counsel but we cannot find it amounts to ineffectiveness for the record does not inform us of the content of the consultations that were held.

[21] At one point after he regained the status of appointed counsel (on appeal) Cantu was discussing matters with him and the judge of the trial court remarked that he "was convinced the investigation [by trial counsel] was not proper" and had "a real concern about the investigation" in the case.

[22] It is certainly true, as the State points out, that Dr. Schlagenhauf diagnosed petitioner as having a personality disorder of the maladaptive type, was inflicted with an inability to tell the truth, is unlikely to benefit from experienced punishment by society, and probably will continue to behave pretty much the same way; asked if petitioner knew the difference between right and wrong, the doctor answered, "I think so." Still, that diagnosis and those observations and opinions do not necessarily contradict the conclusions of the doctor, set out in the text above, and they are surely what a competent criminal defense attorney would want to know about his client charged with capital murder.

[23] Among other testimony the State points to that of petitioner himself:

"Q: There is absolutely nothing wrong with you mentally, is there, Harvey?

A: No, sir; I don't believe so."

But, pertinent in this connection is the poignant observation of Judge Goldberg in *Davis v. Alabama,* supra, at 1220: "An attorney who does seriously interview an arguably insane client may find him to be one of those many insane persons who placidly insist that they are entirely sane ..."

[24] See *Davis v. Alabama,* supra, at 1222-1223, pointing out that in deciding whether a failure to investigate a possible defense was prejudicial by examining the specific evidence that an investigation would have uncovered, as he have here, a court can "avoid speculating about how a jury would have reacted" to that evidence.

[25] As petitioner's psychiatrist testified at the hearing below:

Q [By Mr. Goldstein]: ... Did he [petitioner] have difficulty distinguishing between truth and falsehood?

A: *I don't think I could ever depend on Joe to tell me all of the truth. And I don't know that he could really*—it is kind of hard to even give an example. But he would tell me things that were the truth *if I knew what was going on,* but if I didn't know he might tell me or he might tell me something completely different.

Q: All right. And would it be fair to say that *he did not realize the consequences of his answers regarding truths and untruths?*

A: *I think it is fair.*

Q: Is it not true that *you found that he didn't seem to know the difference between telling truth and an untruth?*

A: *Yes.*

* * * * * *

Q: Doctor, if they had an individual in a life or death situation where that might depend on whether the person was telling the truth or not, would it, in your estimation, *could you have been of benefit to them in terms of advising them of your diagnosis that he [petitioner] was unable to distinguish between truth and falsehood?*

A: *I thought so at the time, and I still do.*

Q: *Did Mr. Conant or anyone else ever come to you and ask you about that and were you able ever to give that opinion to anyone who came to you?*

A: *No.*

Q: *They never came?*

A: *No.*

[26] Q [By Mr. Conant]: After she hit you what did you do?

A: *I was shocked. I didn't know what to think. Why she did it...* It kind of stunned me and then *I guess it was because of the fact I was on drugs, because of the fact of all that was happening,* I just-you know, *she tried to hit me again and then I blocked it and then I stabbed her.*

\* \* \* \* \* \*

Q: Why did you stab her again?

A: *Because she was still shouting, still screaming, just as if-I don't know, she just started screaming more.* I knew that people had heard it so I dragged her to the back...

Q: Well, after you realized that you had stabbed the woman what did you decide to do then?

A: *I had only stabbed her three times* and I looked at her and there was quite a bit of blood all over and I didn't know whether she was dead or not. It looked like she was dead. If she wasn't dead she was dying. *And I started thinking more about the fact that I was on parole. I knew that I had already messed it up* then so I looked for the checks-I knew that I had to have some money to go somewhere then... I took them and I left.

[27] The State ruefully remarks, "The fact that the witness did not testify exactly as anticipated by petitioner's counsel did not establish ineffective assistance of counsel." But the problem is that one cannot safely surmise just what counsel anticipated since the witness attested there was no basis for any expectation.

[28] The record reflects, and opinion of the Court on direct appeal tersely notes, that virtually all potential reversible error in the trial court was not preserved because Conant repeatedly failed to object or request the proper relief when he did object. See *Duffy v. State*, supra at 201 (swearing of jury); at 204 (form of the charge); at 205 (sidebar remark by prosecutor); at 206 (improper jury argument by prosecutor). Others were characterized by the habeas court as "the exclusion of preserving legal points at the time," and the result is a concerted waiver of potentially reversible error. That trial strategy explains silence, especially in a context as compelling as a capital murder trial where the supreme penalty looms large, is a strange concept. Moreover, trial counsel's testimony at the habeas hearing regarding his habitual failure to object reveals that the "trial strategy" argument is devoid of merit in this regard:

Q [By Mr. Goldstein]: Mr. Conant, could you explain why, *if there is a reason,* you failed to make any objections at any time during the course of jury selection or trial and the record is silent with respect to the selection of prospective jurors and any oath they may have taken?

A: No, sir. *I can't explain that.*

Q: Can you explain why, if at all, you acquiesced in and made no objection to the charge given by the Court in this cause?

A: *I felt* the charge was correct under the law, Mr. Goldstein.

Q: Can you explain why you did not request further relief with regard to sidebar remarks by the prosecutor that you objected to and left in the record in the state of an affirmative ruling by the trial court, asking no instruction, not moving for a mistrial, so that no error was preserved with regard to trial sidebar remarks made by the prosecutor in this cause?

A: No, sir. *I can't explain that.*

Q: Can you explain why you made no objection to the prosecutor's statement referring to this trial as an important case and the prosecutor's statements in the intimating [sic] familiarity with the victim's family?

A: Mr. Goldstein, I don't know if you are reading from the record or what you are doing. *I am not sure that I recall these statements being made at that time...*

That Conant's constant failings were within the realm of trial strategy is difficult to accept but, if they were, he had ample opportunities to say so. That he did not, choosing instead to give no explanation at all, refutes the notion that his performance was "tactical" in nature and reinforces our conclusion that the wounds in this instance were self-inflicted. See *Callaway v. State,* 594 **S.W.2d** 440, 444-445 (Tex.Cr.App. **1980**); *Cude v. State,* 588 **S.W.2d** 895, 897-898 (Tex.Cr.App.1979); *Ruth v. State,* 522 **S.W.2d** 517, 519 (Tex.Cr.App.1975) (Morrison, J., concurring).

[29] That *Caraway v. State,* supra, is the turning point is confirmed by *Ex parte Gallegos,* supra, at 511, albeit thereafter "farce and mockery" language occasionally "crept into some of our opinions," *id.* at 512.

Save trees - read court opinions online on Google Scholar.

# – B –

*See pp. 3 & 5, infra*

**493 S.W.2d 214 (1973)**

## Archie BURKHALTER, Appellant,

### v.

## The STATE of Texas, Appellee.

### No. 44675.

**Court of Criminal Appeals of Texas.**

February 21, 1973.
Rehearing Denied April 25, 1973.
Second Rehearing Denied May 9, 1973.

*215 Warren Burnett, Odessa, for appellant.

Carol S. Vance, Dist. Atty., Joe S. Moss, James C. Brough and James Moseley, Asst. Dist. Attys., Jimmy R. James, Sp. Prosecutor, Houston, and Jim D. Vollers, State's Atty., Robert A. Huttash, Asst. State's Atty., Austin, for the State.

# OPINION

ROBERTS, Judge.

The offense is accomplice to murder with malice; the punishment, life.

Appellant does not challenge the sufficiency of the evidence and, therefore, a detailed recitation of the facts is unnecessary. It suffices to say that appellant, a physician, was indicted as an accomplice to murder with malice in the death of Robert J. Pendleton, a fellow physician. Del Monte Whitehurst, a key prosecution witness, and two others were indicted as principals in the same offense. A companion case is Tucker v. State, Tex.Cr.App., 461 **S.W.2d** 630.

The primary question in this case, raised by appellant's first two contentions, is whether the trial court erred in refusing to let the jury hear evidence that the witness Whitehurst's *lawyer* had an understanding with the State that if Whitehurst testified without claiming immunity he would not be prosecuted. A special prosecutor admitted that it was the State's plan to procure witness Whitehurst's release from all charges when appellant's trial was over. Further, it was part of the plan that the State would try Whitehurst if the defense were to request immunity either in open court or otherwise. Thus, the testimony was that the arrangements were to be communicated to appellant's counsel, but not directly to appellant himself.

Appellant's strongest contention is based upon the recent opinion of the United States Supreme Court in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L. Ed.2d 104 (1972). In that case, the witness Taliento testified that:

"Nobody told me I wouldn't be prosecuted... I believe I still could be prosecuted."

In summation, the government attorney reiterated that no promises had been made to Taliento.

While the case was on appeal, the petitioner filed a motion for new trial based on newly discovered evidence and attached an affidavit from one of the prosecutors who was not directly involved in the actual trial stating that he had promised Taliento that all prosecutions against him would be *216 dismissed if he testified against an alleged co-conspirator.

The Court ordered a new trial holding that since the government depended almost entirely on Taliento's testimony, his credibility as a witness was important and the jury was entitled to know about any agreement concerning immunity.

In the case at bar, we have the testimony of the Special Prosecutor that he told Whitehurst's lawyers that if Whitehurst testified for the State without claiming immunity the prosecutions against him would be dismissed, but warned such lawyers not to convey that information to Whitehurst personally.

Attorney Farmer, Whitehurst's lawyer, testified as follows:

"But the way we stated it to him [Whitehurst] was that if he testified it could help him but that we would not promise him nor could anyone else promise him anything in exchange for his testimony."

Further,

"... we didn't tell Whitehurst that if he testified he would be exonerated from this case or any other case. We merely stated that if he testified it could help him."

Quoting Farmer's testimony further:

"Q You did not promise him any particular results, of course.

"A No, sir."

Arguably, the Giglio opinion has no application in the present case, since there is no showing here that the prosecutor ever spoke directly with or conveyed to Whitehurst a *direct promise* that he would not be prosecuted if he testified for the State.

We have closely examined the Giglio decision and we cannot agree that the case turned on this point. Nowhere does the U.S. Supreme Court make such a distinction and we certainly will not imply one. We quote from Giglio:

"Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of *any understanding or agreement* as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." (emphasis supplied)

The court did not say "any agreement between the witness and the prosecutor" or "in cases where the agreement is directly conveyed to the witness." Such language unduly restricts the very reasoning behind Giglio: that is, that the jury should have the opportunity to decide the witness's credibility for themselves.

We recognize the argument that while the witness's state of mind while testifying and his expectations were not mentioned in Giglio, the court there was faced with a different factual situation. Admittedly, that court was not faced with and did not address a situation where the witness granted immunity was completely ignorant of any agreement as to future prosecution. In our opinion, neither is it clear that this Court is presented with such a case.

the Court Reporter's Trial Record

The record reveals the following colloquy, heard during the motion for a new trial:

(Testimony of Whitehurst's attorney)

"A ... and we were careful not—I was careful, and I assume Mr. Neisig was, I know he was, we were together, that he didn't tell Whitehurst that if he testified that he would be exonerated from this case or any other cases. We merely stated that if he testified that it could help him.

"Q If he testified it could help him?

"A If he testified it could help him.

"Q You did not promise him any particular results of course?

*217 "A No, sir.

"Q But you did tell him that if he testified that it could help him?

"A If he wanted to testify, it could possibly help him.

"Q In other words, it would be fair to say that he was allowed to know that if he testified that it could be of benefit to him?

"A It could be.

"Q He was made to know that?

"A We communicated that to him. But that was as far as we went with this."

Thus, the record indicates that both Whitehurst and his attorney admitted that, although no direct promise of immunity from prosecution was ever conveyed to Whitehurst, he was told that his testimony "could help his case." We find it unrealistic to draw a line between an outright promise not to prosecute and a very real inference not to prosecute.[1] The suggestions and innuendos in the present case bring appellant within the rule announced in Giglio.

Further, evidence that witness Whitehurst was not completely in the dark is revealed by the record, in reference to the visit by Phil Greene. Mr. Greene, an attorney, allegedly called on Whitehurst during the course of the trial and urged him to seek immunity before testifying. With Whitehurst testifying, the record reflects:

"A Well, it was a lawyer who come up to visit me the other night who wanted to represent me. He told me that he would get me immunity out of this murder case and would handle all of the other charges for me. He almost demanded that I come down here and take immunity. It took me two hours last night to run him off.

\* \* \* \* \* \*

"Q You deny that you are expecting that?

"A I was offered that last night. I turned it down.

"Q So now your testimony before the jury is that you were offered that you could go absolutely scot-free, but that you turned it down?

"A Yes, sir.

"Q You don't want to be scot-free, right?

"A Well, I didn't want to look at it the way he was trying to do it."

Surely, it must have struck the trial judge as unusual, to say the least, that a co-indictee in a murder case would "run off" an attorney who suggested that he should go into open court and demand immunity before testifying. One reasonable inference to be drawn from Whitehurst's actions is that he knew of the State's plan *218 not to prosecute, but also knew not to mention it for fear of jeopardizing the entire scheme. Whether or not this is true is not for us to decide. The point is that *the jury should have been given the opportunity to judge Whitehurst's credibility for themselves.* The trial court's refusal to permit disclosure of the State's plan not to prosecute Whitehurst deprived the jury of that function.

Further, we find that such a deprivation amounted to a denial of due process. It is axiomatic that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction. This rule does not cease to apply merely because the false testimony goes only to the credibility of the witness. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 2d 1217 (1959). As recognized in Napue, the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.

We fully appreciate the State's position that there was no false evidence here, since Whitehurst did not *know* that he would not be prosecuted. Even if we assume this ignorance, arguendo, we find that the prosecutor's silence as to the plan not to prosecute conveyed an impression to the jury which the State knew to be false and one which should have been corrected. On cross-examination, Whitehurst gave the following testimony:

"Q And you fully expect that when this case is over, not only will you be out of this case but all other charges against you?

"A No, sir."

Appellant was not accorded due process of law when he was denied the opportunity to refute the inevitable impression that such testimony had on the jurors; that is, that Whitehurst would obtain no reward for testifying. Defense counsel should have been permitted to place the parties in proper perspective and develop further the interests involved.[2] cf. Alcorta v. Texas, 355 U.S. 32, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957).

The State answers that if there was any error in refusing to let the jury hear the disputed testimony, it was harmless error. We disagree.

Whitehurst was the only source of direct testimony tending to establish the alleged main fact of appellant's advising the commission of the offense charged in this case. As previously stated, it is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon appellant's guilt.

"A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. * * * That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." Napue, supra, 360 U.S. at p. 269, 79 S.Ct. at p. 1177.

We cannot pretend to be oblivious to the time and expense involved in the presentation of this cause; the voluminous record now before this Court is sufficient evidence of that. Our intent is not to punish the trial court or the prosecutor for the error committed, but rather to avoid an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*219 Our holding today is not to be taken as a ruling that the procedure used by the State here is unconstitutional per se. Certainly, each case must turn on its particular circumstances. In the instant case, the State could easily have preserved Whitehurst's "unawareness" and, at the same time, protected appellant's constitutional guarantees. The rule had been invoked at the beginning of the trial. Therefore, the State could have presented testimony before the jury disclosing the plan with Whitehurst's attorney and thereby have permitted them to judge his credibility. In such a circumstance, and where the witness is indeed non-cognizant of the plan, we would commend the prosecution.

We simply hold that Giglio, supra, is constitutionally dictated and cannot be cleverly circumvented in this case by the scheme used by the State. Due process, perhaps the most fundamental concept in our law, embodies principles of fairness rather than an immutable line drawing as to every aspect of a

criminal trial. Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). See also Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

In light of the disposition of this ground of error, we will not consider appellant's other grounds.

The judgment is reversed and the cause remanded.

MORRISON, Judge (dissenting).

I am thoroughly in accord with the holding of the Supreme Court of the United States in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. I have concluded that the circumstances in the case at bar, though similar to those in Giglio, supra, are, nonetheless, factually distinguishable.

Giglio, supra, revolves around the jury's right to know "of any understanding or agreement as to future prosecutions" between a witness and the State as an aid in judging the witness' credibility. In Giglio, supra, there was a consummated agreement between the witness and the prosecution. The jury was not only ignorant of the agreement, but the witness, Taliento, lied to them about its existence.

In the case at bar, there is no evidence to indicate that *the witness* Whitehurst knew he would be granted immunity or that he had lied to the jury about his prospects for receiving it. The majority claims that the court erred in failing to permit the jury to hear testimony which would have shown the State planned to grant Whitehurst immunity. However, the prosecution's intention is not the critical factor. The rationale for permitting the jury to hear testimony about an "arrangement" is that such information may be a factor in determining the witness' credibility. The witness' motives and bias, then, are the controlling element. It, therefore, follows that the jury need not be given more information than the witness himself actually possesses.

Further, it cannot be said the jury was unaware of Whitehurst's position and possible motives. Appellant's vigorous cross-examination of Whitehurst included thorough questioning about the possibility that his testimony might earn him a dismissal of charges against him. Certainly these various references to immunity, dismissal, and other cases pending against Whitehurst, including an indictment for Pendleton's murder, were sufficient to alert the jury to Whitehurst's interest in the case. [1]

*220 In United States v. Blackwood, (2 Cir.) 456 F.2d 526, the U. S. Court of Appeals for the Second Circuit considered a similar situation stating:

> "... A defendant's major weapon when faced with inculpatory testimony of an accusing witness often is to discredit such testimony by proof of bias or motive to falsify.... The rule is that [in] attempting to establish the motives or bias of a witness against him, a defendant may ... elicit evidence showing that the government made explicit promises of leniency in return for cooperation.

> * * * * * *

"A defendant's right to elicit such evidence, however, is not boundless, but is subject to reasonable limitations imposed by the trial judge in the exercise of sound discretion. The test for determining whether there has been an abuse of discretion is whether `the jury was otherwise in possession of sufficient information concerning formative events to make a "discriminating appraisal" of a witness' motives and bias.'"

The Court there concluded, as I do here:

"We are satisfied that the circumstances from which the jury could decide whether [the witness] might have been inclined to testify falsely in favor of the government were adequately presented to the jury in this case."

The only suggestion that more existed than was made known to the jury comes from the defense. Whitehurst's testimony was critical to the prosecution, perhaps determinative. It is reasonable to assume that appellant's trial strategy would include an effort to discredit the witness' testimony. It is not surprising that appellant's attorney cross-examined Whitehurst extensively concerning his prospects for immunity. Counsel concentrated particularly on Whitehurst's conversation with "a lawyer who came to see him the other night.... [He] gave his name as Phil Green."[2]

Who was Phil Green? He was not on the prosecutor's staff nor was he appointed by the court to represent Whitehurst. The record does not reflect his exact connection with the case. The record does, however, suggest he played a role in the defense's effort to discredit Whitehurst's testimony by attempting to compromise him. Whitehurst testified that Green came to see him shortly before he was scheduled to testify and told him that if he demanded immunity during the trial, he, Green, would arrange to have Warren Burnett, Burkhalter's trial attorney, and another, represent him in the cases pending against him.[3] Burnett, himself, confirmed Green's *221 visit to Whitehurst during his argument to the jury. A demand for immunity by Whitehurst, particularly during the trial, would have placed the State in the position of either granting the immunity or dismissing the prosecution. If immunity were granted the defense could launch an unrestrained attack on the reliability of the witness' testimony.

It is obvious from the record that the jury knew of the possibility of immunity and that they were in a position to judge his credibility accordingly. I would, therefore, reject appellant's effort to hoodwink the jury and this Court. Certainly the logic and rationale of Giglio, supra, should not be read to permit or encourage the defense tactics in evidence here.[4] I respectfully dissent.

DOUGLAS, J., joins in this dissent.

## ON STATE'S MOTION FOR REHEARING

DOUGLAS, Judge (dissenting).

The majority overrule the State's motion for rehearing. The conviction was reversed because appellant was not allowed to prove before the jury that the special prosecutor James had told counsel

for the accomplice witness Whitehurst that he would not be prosecuted even though this was not communicated to the witness. While I agree with practically everything that was said in the original dissent, my views are set out below:

The record shows that this is a case where the appellant, Dr. Burkhalter, hired the accomplice witness Del Monte Whitehurst and others to kill Dr. Burkhalter's partner, Dr. Pendleton. There had been some personal difficulties between the two doctors and Dr. Burkhalter was to benefit from an insurance policy on the life of Dr. Pendleton.

The majority based the reversal upon the case of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. In that case there was a direct agreement with the accomplice witness Taliento to grant him immunity. In the present case all the testimony in the record at the trial and on the motion for new trial shows that there was no communication or agreement with the *222 witness Whitehurst that he would not be prosecuted. These two fact situations are quite different.

How would statements between counsel affect the credibility of a witness who had not heard nor been informed about the conversation? No fact issue was made. Giglio v. United States, supra, was reversed because there was an agreement, or at least an affidavit by a prosecutor, that there was a direct agreement with the witness that immunity would be granted him if he testified.

The majority, in reversing the conviction in the present case, stated: "Arguably, the Giglio opinion has no application in the present case, since there is no showing that the prosecutor ever spoke directly with or conveyed to Whitehurst a *direct promise* that he would not be prosecuted if he testified for the State."

The majority in the above quote have made the obvious distinction and by omitting the word "arguably" the statement would be entirely correct.

In the next paragraph the majority state that they would not agree that the Giglio decision turned on this point. This statement is correct because the fact situation in the present case was not before the Supreme Court when it handed down the Giglio decision.

The majority state:

> "We find it unrealistic to draw a line between an outright promise not to prosecute and a very real inference not to prosecute."

and

> "The suggestions and innuendos in the present case bring appellant within the rule announced in Giglio."

Then the majority, using the testimony about the attorney Green who, this record shows, had no authority to make any promise to Whitehurst, offered to have defense counsel in the present case defend him if he would claim immunity in open court.

Surely, it must have struck the trial judge as unusual, to say the least, that a lawyer without being sent for and who was in an apparent violation of the code of ethics would go to the jail and offer the services of appellant's counsel in the present case to Whitehurst in his future trials.

Counsel for the defense have not attempted to show that this attorney who visited Whitehurst was sent by the prosecution, nor have they shown that defense counsel did not send him so that they might argue before the jury about what occurred.

Cannot some sort of an inference be reached when any co-defendant testifies for the State against a defendant?[1] Does it not follow from the majority opinion that in each case where a co-defendant testifies for the State that no promises have been made him, that a defendant can then call the assistant district attorney trying the case, the first assistant district attorney, the district attorney and perhaps other prosecutions to determine if the prosecution intended to dismiss charges or grant immunity? This would be analogous to the present situation though no promise had been made. The defense could explore the minds of those in the district attorney's office to determine their future plans because the innuendos or inferences would be there.

The majority state that they appreciate the State's position that there was no false evidence here since Whitehurst did not know he would not be prosecuted. Then it is stated, "Even if we assume this ignorance, arguendo, we find that the prosecutor's silence as to the plan not to prosecute conveyed an impression to the jury which the State knew to be false and one which should have been corrected." It has always been the rule that when witnesses *223 testify before a trial judge, it is his and not this Court's function to decide their credibility. There is nothing for this Court to assume. The witnesses at the trial, outside the presence of the jury, and on the motion for new trial, were heard by the trial judge. He saw and heard the witnesses and observed their demeanor on the stand. He apparently believed them, because he did not grant a new trial.

Again, referring to the example where the prosecutor in his mind had decided not to prosecute a co-defendant witness for the State who testifies that he expects to be prosecuted: Does the prosecutor then and there have to inform the jury that he does not expect to prosecute to keep from leaving a false impression before the jury?

The majority quote from <u>Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)</u>: "A lie is a lie, ..." That case holds that the district attorney has a duty to correct what is false. In the present case no lie or false testimony has been shown. No correction was required; no fact issue created.

It was shown that Whitehurst was an ex-convict. He had served sentences in New Mexico and in Texas. He obtained the "trigger man" and helped carry out the murder in the present case. There is no doubt that he hoped to obtain leniency and just as much as the State would recommend, but still there is no proof that leniency or immunity was offered to him. It does not take much logic or common sense for anyone to realize that he was not going to incriminate himself unless he thought his chances for at least some leniency was good. Jurors have common sense and they no doubt thought Whitehurst was testifying in an effort to help himself. They heard the evidence that he had been convicted before. They could and probably did infer that he wanted to help himself.

If there was any doubt that the jury did not have this in mind, it was erased when counsel for the defense argued that one must wonder if the charges against Whitehurst will be dismissed and if he would go "scot free" and "one must wonder if he succeeded in his effort to earn advantage for himself."

No constitutional or statutory right was denied the appellant. This reversal is apparently on some new rule or concept that proof to disprove an innuendo or suggestion on a collateral matter must now be admitted even though all of the direct evidence is to the contrary.

This Court has always permitted impeachment of a witness on what he says and what he does to show bias or interest. See Jackson v. State, Tex.Cr.App., 482 S. W.2d 864. No prior inconsistent statement is shown in the present case. The rules for impeachment because of a prior inconsistent statement are clear, but by what rules may one impeach an innuendo or a "very real inference not to prosecute?"

For the above reasons, the State's motion for rehearing should be granted and the judgment affirmed.

[1] In Giglio, two different affidavits were filed in reference to newly discovered evidence. One affidavit states outright that a promise was made to Taliento that if he testified, he would not be prosecuted. The second affidavit (which the U.S. Supreme Court saw fit to set out in the text of their opinion, rather than in a footnote, as they did with the first affidavit) stated that: "he [the U.S. Attorney] had personally consulted with Taliento and his attorney shortly before trial to emphasize that Taliento would definitely be prosecuted if he did not testify and that if he did testify he would be obliged to rely on the `good judgment and the conscience of the government' as to whether he would be prosecuted." The court noted that this latter affidavit, standing alone, contains at least an *implication* that the government would reward the cooperation of the witness, and hence, "tends to confirm rather than refute the existence of some understanding for leniency." Giglio, supra, 405 U.S. at p. 153, 92 S.Ct. at p. 765, 31 L.Ed.2d at p. 108. It, thus, appears to this Court that even in Giglio, there was some question as to the "directness" and unequivocality of the agreement not to prosecute.

[2] 1 C. McCormick & R. Ray, Texas Evidence, § 673 (2d ed. 1956) states: "Where an accomplice in the crime with which accused is charged testifies for the prosecution this is a circumstance affecting his credibility. It indicates a probability that he is seeking or has been promised favor at the hands of the State."

[1] Some of the evidence brought out before the jury included:

"[Prosecutor] You are the same Del Monte Whitehurst that has been indicted for the killing of Robert Pendleton, is that correct?

"[Whitehurst] Yes, sir"

In addition to the testimony in Footnote (3), infra, Defense Counsel Burnett argued to the jury:

"One must wonder what will become of Del Monte Whitehurst as a result of the perjury that he gave in this case. One must wonder what advantage he has earned. One must wonder what will become of him in the days and in the weeks to come after this trial is concluded. One must wonder what will become of the charges against Del Monte Whitehurst. One must wonder whether they will be dismissed. One must wonder whether or not he will go scot-free. One must wonder if his plan so wicked and so beyond description has worked. One must wonder if he succeeded in his effort to earn advantage for himself. One must ask to receive this earning, if when this trial is over, if there will be a dismissal of all of the murder charges against Whitehurst."

[2] This name is variously spelled Green and Greene.

[3] Burnett's cross-examination of Whitehurst concluded with the following:

"Q. You did not have a conversation yesterday with the Special Prosecutor in the case, Mr. Jimmy James?

"A. Well, it was a lawyer who come up to visit me the other night who wanted to represent me. He told me that he would get me immunity out of this murder case and would handle all of the other charges for me. He almost demanded that I come down here and take immunity. It took me two hours last night to run him off.

* * * * * *

"Q. You fully expect that when this case is finally concluded, that you will be out, don't you?

"A. No, sir. That is what the lawyer wanted to get done for me last night.

"Q. And you fully expect that when this case is over, not only will you be out of this case but all other charges against you?

"A. No, sir.

"Q. You deny that you are expecting that?

"A. I was offered that last night. I turned it down.

* * * * * *

"Q. He wanted you to do it in open court, didn't he?

"A. Well, I give a statement and agree to testify and then wait until the trial got halfway through and come on down and demand that I wasn't going to get on the stand unless I get immunity.

"Q. He wanted you to do it in open court, didn't he?

"A. He wanted me to do it when I come down for them to put me on the stand."

In answer, Prosecutor James questioned Whitehurst on redirect examination:

"Q. Let's talk about this lawyer that came up to see you: Do you know what his name is?

"A. Yes, sir.

"Q. What is it?

"A. He gave it to me as Phil Green.

"Q. Some time late last night did he tell you he wanted to represent you?

* * * * * *

"A. He told me that if I would let him come to the courtroom and demand immunity this morning, that Bob Tarrant and Mr. Burnett would represent me on the rest of my cases that I have pending against me.

"Q. So this was the good deal he offered you, to represent you—if you got immunity in this case—on your other cases, is that correct?

"A. Yes, sir.

"Q. Did you send for this lawyer?

"A. No, sir.

* * * * * *

"Q. So all of a sudden out of a clear blue sky, now appears the saving angel, is that correct?

"A. Yes, sir.

"Q. He is going to do wonders for you along with Mr. Burnett and Tarrant, is that correct?

"A. Yes, sir."

[4] Robert D. Tucker, Jr.'s, 99-year conviction was affirmed by this Court (461 **S.W.2d** 630) on Del Monte Whitehurst's testimony.

[1] 1 C. McCormick & R. Ray, Texas Evidence, Section 673 (2d ed. 1956).

Save trees - read court opinions online on Google Scholar.

# the
# COVER
# letter(s)

# Philip W. "Phil" Moore

**Phone: (512) 667-1508**

15623 Fagerquist Road ◆ Del Valle, Texas 78617-5800          e-mail: pwm11.07@gmail.com

Wednesday, March 18th, 2015

Debbie Folse, Deputy Clerk
Jefferson County District Clerk's Office
Jefferson County Courthouse, Room 203
1085 Pearl Street
Beaumont, Texas 77701-3545

## in re Ex parte Carl Matthew Bellotti, III, No. WR-53,835-05: AN UNCOMMON PLEA — from an all-too-common *victim!*

Dear Debbie,

Please find enclosed three (3) true and correct **date-stamped** *"RECEIVED" (in the Court of Criminal Appeals)* copies[1] of my NOTICE in re the *"Off Limits"* trial Record[2] pleading(s) in the above-styled and numbered cause.

---

[1]      . . .onc copy being intended for the records and files of the Jefferson County District Clerk's Office with one (1) copy **each** provided for Judge West and for the State's Postconviction Attorney, Deborah Ann (Ann) Manes.

[2]      . . .the **five *(5)* volume** Record which Deborah Ann (Ann) Manes stated to me was *"Off Limits"* in habeas cases despite the **Strickland** Court's mandate(s) that

> ". . .a court deciding an actual ineffectiveness claim *must* judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct.* A convicted defendant making a claim of ineffective assistance *must* identify the acts or omissions of counsel **[shown in the Official *Reporter's* (trial) Record]** that are alleged not to have been the result of reasonable professional judgment. The court *must* then determine whether, in light of all the circumstances, the *identified* **[in the Official *Reporter's* (trial) Record]** acts or omissions were outside the wide range of professionally competent assistance. . . ."

Id., 466 U.S. 668, 690 (1984).

-1-

. . .and allow me to *once again* thank you (and all of the girls there in your office – including Hope) for y'alls style, aplomb and professionalism in your dealing(s) with me in the premises*!*

   ". . .and miles to go before I sleep, and miles to go before I sleep."

   Respectfully submitted,

   Philip W. "Phil" Moore

PWM/*pwm*

Enclosures


cc.    Carl Matthew Bellotti, III, 1755639
       East Texas Treatment Facility
       P.O. Box 8000
       Henderson, Texas 75653-8000

       Carl S. Bellotti, Jr.
       2122 Merriman Street
       Port Neches, Texas 77651-3728
       Phone: (409) 626-4542

       Hon. Abel Acosta, Clerk
       Texas Court of Criminal Appeals
       Supreme Court Building
       201 West 14th Street, Room 106
       P.O. Box 12308
       Austin, Texas 78711-2308
       Phone: (512) 936-1620
       FAX: 512/463-7061
       e-mail: abel.acosta@txcourts.gov

       s e v e r a l   others

       file(s)


- 2 -